UNITED STATES BANKRUPTCY COURT                    ID #13-3716467
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In Re:                                             Chapter 11

DORIS PANOS DESIGNS, LTD.,                          Case No. 09-72685-ast
                                                    Honorable Alan S. Trust
                              Debtor.
-----------------------------------------------------------x


## SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN
## OF REORGANIZATION PROPOSED BY DORIS PANOS DESIGNS, LTD

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS
DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR
UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF
REORGANIZATION. THE PLAN PROPONENT BELIEVES THAT THIS PLAN OF
REORGANIZATION IS IN THE BEST INTERESTS OF CREDITORS AND THAT
THE PLAN IS FAIR AND EQUITABLE. THE PLAN PROPONENTS URGE THAT
VOTERS ACCEPT THE PLAN.

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.


Dated: East Meadow, New York
       July 16, 2010

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
A. Purpose of this Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
B. Recommendation of the Proponents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
C. Voting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  1. Voting Classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  2. Presumed Acceptance of Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  3. One Vote Per Holder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
D. Procedures and Deadlines for Completing Ballots and Voting . . . . . . . . . . . . 4
E. Procedures for Vote Tabulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
F. Confirmation Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. GENERAL FRAMEWORK OF THE PLAN AND EXPECTED RETURN TO
GENERAL UNSECURED CREDITORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
A. Sale of the Estate's Inventory to Make Payments to Creditors . . . . . . . . . . . . 5
B. Estimated Recovery by Holders of Allowed General Unsecured Claims . . . . . . 6
C. Estimated Recovery By Debtor From Adversary Proceedings . . . . . . . . . . . . . 6

III. BACKGROUND INFORMATION ABOUT THE DEBTOR . . . . . . . . . . . . . . . . 7
A. Description of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
B. Financial Condition of the Debtor and Events Leading to Chapter
   11 Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  1. Gerber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  2. Other Prepetition Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  3. The Debtor's Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV. PROCEEDINGS DURING CHAPTER 11 CASE . . . . . . . . . . . . . . . . . . . . . . . 10
A. The Chapter 11 Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  1. Retention of Professionals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  2. Attempts to Obtain Debtor in Possession Financing . . . . . . . . . . . . . . . . . 11
  3. Paul Panos - DIP Lender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  4. The Debtor's Motion to Use Existing Stationary . . . . . . . . . . . . . . . . . . . . 12
  5. The Debtor's Motion Under Rule 2004 for the Examination of Gerber . . . . . . 12
  6. Gerber Inventory Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  7. The Debtor's Motion Pursuant to Section 366(b) . . . . . . . . . . . . . . . . . . . . 13
  8. The Debtor's Motion to Extend its Exclusivity Periods . . . . . . . . . . . . . . . . 13
  9. Claims Bar Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  10. Negotiations with TJ Maxx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11. Negotiations with Home Shopping Network ........................... 14
12. Claims Analysis ................................................... 14

B. The Debtor's Litigation Posture ..................................... 15
  1. Gerber-related Contested Matters ................................. 15
  2. The Debtor's Litigation Posture with Chopard .................... 16
  3. Mediation with Gerber and the Committee ........................ 16
  4. The Debtor's Litigation Posture with Nieman-Marcus
     and Other Retailers ........................................... 17
  5. The Debtor's New Lease in Port Washington ...................... 18
  6. Adversary Proceedings .......................................... 19
  7. Other Collection Efforts ....................................... 20

V. DESCRIPTION OF THE PLAN ............................................ 21
A. Description and Treatment of Unclassified Claims ................... 21
  1. Administrative Claims .......................................... 21
  2. Priority Tax Claims ............................................ 21
B. Description and Treatment of Classified Claims ..................... 21
  Class 1 – Allowed Administrative Claims ........................... 22
  Class 2 – Allowed Priority DIP Loan of Paul Panos ................ 22
  Class 3 – Allowed Unsecured Priority Claims ...................... 23
  Class 4 - Allowed General Unsecured Claims ....................... 23
  Class 5 - Allowed General Unsecured Subordinated Claim
     of Doris Panos ............................................... 23
  Class 6 – Interests .............................................. 23

C. Conditions to Confirmation of the Plan ............................. 24

D. Conditions to Occurrence of the Effective Date .................... 24

E. Description of Certain Other Significant Plan Provisions ........... 25
1. Proofs of Claim for Rejection Damages ............................ 25
2. Late Filed Claims ............................................... 25
3. Disputed Claims; Distribution Rights ............................ 25
4. Retention of Jurisdiction ....................................... 25
5. Unclaimed Distributions ......................................... 27
6. Miscellaneous Provisions ........................................ 28

VI. FEASIBILITY AND RISK FACTORS ...................................... 28
A. Feasibility of the Plan ............................................ 28
B. Risk Factors ...................................................... 28

VII. ALTERNATIVES TO THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
A. Liquidation Under Chapter 7 of the Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
B. Alternatives to the Debtor's Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VIII. TAX CONSEQUENCES OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IX. REQUIREMENTS FOR CONFIRMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

X. CONCLUSION AND RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

W:\Clients A-Z\Clients A-E\Doris Panos Designs\Bankruptcy\Plan & Disclosure statement\Amended Plan&Disclosure Statement\7-16-2010
Disclosure\Second Amended Table of Contents.wpd

-iii-

# I. INTRODUCTION.

This Amended Disclosure Statement (the "Disclosure Statement") is submitted by **DORIS PANOS DESIGNS, LTD** (the "Debtor" or "Proponent") in connection with the Plan of Reorganization (the "Plan") proposed by the Proponents. A copy of the Plan is attached hereto as **Exhibit "A."**

The Plan and Disclosure Statement contain many defined terms, identified by the use of initial (first letter) capitalization. Unless otherwise expressly defined herein, initially capitalized terms used herein and in the Plan shall have the meaning ascribed to them in the Plan. In the case of any perceived or actual conflict between defined terms in this Disclosure Statement and the Plan, the Plan shall control.

## A. Purpose of this Disclosure Statement

The purpose of this Disclosure Statement is to enable creditors to make an informed decision in exercising their right to vote on the Plan. However, only the Holders of Allowed Claims for a Class that is Impaired under the Plan are entitled to vote on the Plan. Voting rights of individual Classes are discussed more fully below.

This Disclosure Statement is intended to provide such information as may be material, important and necessary for a reasonable investor or creditor typical of the Holders of Impaired Claims to make an informed decision whether to vote in favor of or against the Plan. This Disclosure Statement, therefore, describes the business background and operating history of the Debtor, explains certain significant events that preceded and occurred during this chapter 11 case, describes the Estate Assets, summarizes the terms of the Plan, and provides relevant financial information. THIS DISCLOSURE STATEMENT, HOWEVER, IS NOT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL. YOU ARE URGED TO REVIEW THE PLAN CAREFULLY BEFORE VOTING.

By Order dated _____, 2010, the Bankruptcy Court approved this Disclosure Statement, finding that it contained adequate information as required by Section 1125 of the Bankruptcy Code. The Bankruptcy Court has not passed on the merits of the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN

PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. WHILE IT IS BELIEVED THAT THE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS, WHICH ARE CONTROLLING IN THE EVENT OF ANY INCONSISTENCY. EACH HOLDER OF A CLAIM IS URGED TO REVIEW THE PLAN AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

NO REPRESENTATIONS CONCERNING THE PLAN, THE DEBTOR, ITS BUSINESS OPERATIONS, THE VALUE OF ITS PROPERTY OR THE VALUE OF BENEFITS OFFERED TO CREDITORS OR OTHER PARTIES IN INTEREST IN CONNECTION WITH THE PLAN ARE AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE CONTRARY TO THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.

NEITHER THE PLAN NOR THIS DISCLOSURE STATEMENT HAVE BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE FAIRNESS OR MERITS OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

YOU ARE NOT TO CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS LEGAL, TAX OR ACCOUNTING ADVICE BUT SHOULD CONSULT YOUR COUNSEL, ACCOUNTANT AND BUSINESS ADVISORS AS TO LEGAL, TAX AND ACCOUNTING MATTERS CONCERNING THE PLAN.

## B. Recommendation of the Proponents

The Proponent recommends that creditors vote to accept the Plan. The Proponent believes that the Plan is the best means to maximize the value of the Debtor's

Estate and to provide the greatest and quickest distribution to creditors on account of their Allowed Claims. The Plan, as opposed to dismissal of the case or conversion of the case to a chapter 7 liquidation, will permit a greater distribution to all unsecured creditors. The treatment of creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.

## C. Voting Requirements

Pursuant to the Bankruptcy Code, only Classes of Allowed Claims that are Impaired under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims that are not Impaired are not entitled to vote and are deemed to have accepted the Plan. Further, under the Plan, the Holders of Interests of the Debtor (the Debtor's existing shareholders) will only receive a distribution if all Allowed Claims are paid in full. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class actually voting.

Only Holders of Allowed Claims shall be entitled to vote on the Plan. A Claim to which an objection has been filed, or a Claim which is listed in the Debtor's Schedules as contingent, unliquidated or disputed is a Disputed Claim, not an Allowed Claim, unless and until the Bankruptcy Court rules on the objection and has allowed the Claim. Therefore, although each Holder of a Claim subject to a pending objection will receive a Ballot, its vote will not be counted unless such Claim becomes an Allowed Claim prior to the Voting Deadline or (i) such Holder of a Disputed Claim files a timely motion requesting the Bankruptcy Court enter an order estimating or otherwise resolving its Disputed Claim and (ii) the Bankruptcy Court enters an order (a) estimating the Allowed Amount of the Claim under Section 502(c) of the Bankruptcy Code prior to the Voting Deadline or (b) temporarily allowing the Claim in an estimated amount solely for purposes of voting on the Plan under Bankruptcy Rule 3018(a). A creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith and in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

### 1. Voting Classes

Classes 1, 2, 4 and 5 will be solicited with respect to the Plan.

### 2. Presumed Acceptance of Plan

Class 3 is unimpaired under the Plan and, therefore, is conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 3. One Vote Per Holder

If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

### D. Procedures and Deadlines for Completing Ballots and Voting

A Ballot for accepting or rejecting the Plan is enclosed for use by those Holders of Allowed Claims entitled to vote on the Plan. Holders of Claims entitled to vote should carefully read the instructions contained on the Ballot and complete, date, sign and mail or fax the Ballot to the address indicated on the Ballot so that it is received no later than August 11, 2010. In order for your vote to be counted, your properly completed Ballot must be actually received at the address indicated on the Ballot no later than August 11, 2010 at 4:00 p.m. E.S.T. Holders of Claims entitled to vote may also submit the properly completed Ballot by fax to 516-228-3396.

### E. Procedures for Vote Tabulation

In determining whether the Plan has been accepted or rejected, any Ballot timely received that contains sufficient information to permit the identification of the claimant, is signed by the claimant or an authorized agent and is cast as an acceptance or rejection of the Plan will be counted.

The following Ballots will not be counted in determining whether the Plan has been accepted or rejected: (a) any Ballot received after the voting deadline as set by the Bankruptcy Court; (b) any Ballot that is not signed or that contains insufficient information for the identification of the claimant; (c) any Ballot timely received that indicates neither an acceptance nor a rejection of the Plan; (d) any Ballot timely received that both indicates an acceptance and a rejection of the Plan; (e) any Ballot cast by an entity, other than the holder of a claim that is deemed Allowed under the Plan, that is a creditor or Interest Holder who is not listed as a creditor or Interest Holder on the Debtor's Schedules or whose Claim or Interest is listed as disputed, contingent or unliquidated, and who has not timely filed a Proof of Claim or Interest with respect to the Claim or Interest being voted; or a creditor or Interest Holder who has timely filed a Proof of Claim or Interest that is the subject of an objection and who has not obtained the temporary allowance of its claim for voting purposes; and (f) any Ballot cast by a person who does not hold a Claim or Interest in the class in which it voted.

Whenever two or more Ballots are cast by the Holder of the same Claim prior to the voting deadline, the last Ballot received prior to the voting deadline will be deemed to reflect the voter's intent and thus supercede prior Ballots.

## F. Confirmation Hearing

The Bankruptcy Court has entered an order fixing August 18, 2010 at 10:30 a.m., Courtroom 960, United States Bankruptcy Court, Long Island Federal Courthouse, Central Islip, New York as the date, time and place for the hearing on Confirmation of the Plan, and fixing August 11, 2010 as the last date for filing objections to Confirmation of the Plan and voting to accept or reject the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof provided that any adjournment of the Confirmation Hearing shall not serve to extend the last date to file an objection to the Plan or to vote to accept or reject the Plan.

## II. GENERAL FRAMEWORK OF THE PLAN AND EXPECTED RETURN TO GENERAL UNSECURED CREDITORS

The following discussion provides a general overview of the Plan and is qualified in its entirety by reference to the detailed information set forth in the Plan. This Disclosure Statement also contains a more detailed description of the Plan in Section V below.

## A. Sale of the Estate's Inventory to Make Payments to Creditors

Upon the biannual distribution dates beginning in August 2010, or as soon thereafter as is practicable (and if such claim is for professional fees or expenses, upon a determination by the Court that such fees are reasonable and allowable), each holder of an allowed administration claim shall be paid in cash in full in an amount equal to 100% of each such allowed claim.

The estimated amount of administrative fees approaches $500,000.00. With the consent of each of the Administrative Creditors, the Debtor will seek a payout over two to three years. The Debtor proposes to pay the Administrative Fees and expenses to Class 1 Claimants on a pro-rata basis over two to three years (assuming a profit of approximately $120,000.00 - $226,000.00 per year). Such payments will take place during years One, Two and Three of the plan. This class is impaired.

Upon the biannual distribution dates, or as soon thereafter as is practicable, Paul Panos shall be paid in cash in full, on a pro-rata basis, the remaining DIP facility money ($55,000) plus interest on a pro rata basis during years One, Two and Three of the plan. The claim of Mr. Panos will be paid on a pro rata basis with the Class 1 Creditors. This class is impaired.

Class 3 contains claims of the NYS Department of Taxation and Finance ("NYS"). NYS has amended its proof of claim to reflect an unsecured priority claim of $1,587.58.

This amount shall be paid upon the effective date of the Plan, or as soon thereafter as is practicable. This class is not impaired.

## B. Estimated Recovery by Holders of Allowed General Unsecured Claims

Based on sales projections, expenses, cost of manufacturing inventory, etc., the Debtor estimates net profits to be as follows: for the year 2010, $196,982.00; for the year 2011, $181,670.00; for the year 2012, $198,092.00, for the year 2013, $222,636.00, for the year 2014, $250,135.00, for the year 2015, $285,883 and for the year 2016, $325,206.00. The Debtor needs to retain some profit to fund ongoing working capital needs, and will pay 75% of profit out to unsecured creditors. See Budget and Operating Statement annexed at **Exhibit "B."**

Based on the Distributions provided for under the Plan, Holders of General Unsecured Claims shall receive Distributions, on account of their Allowed General Unsecured Claims, in an amount equal to approximately 10% and possibly as high as 40% of the Allowed Amount of their Allowed General Unsecured Claims. Based on sales projections, expenses, cost of manufacturing inventory, etc., the Debtor estimates that it can dedicate $108,000.00-$160,000.00 per year toward payment of unsecured creditors during Years Three, Four, Five (and if necessary), Six and Seven of the plan. All Allowed Unsecured Claims, now estimated after further review in the amount of $1,500,000, will be paid *pro rata* from the above sums paid in installments over Years Three, Four, Five (and if necessary), Six and Seven of the plan. This class is impaired.

Doris Panos holds a general unsecured claim in the amount of $300,000. This sum consists of loans Ms. Panos made to the Debtor over a span of many years. Ms. Panos will subordinate her business loans of approximately $300,000. There will be no equity distribution to shareholders, except for salary, over the life of the Plan.

The Proponents believe that the proposed distribution is much greater than that which Holders of Allowed Claims would otherwise receive if any of the alternatives to the plan set forth in Section V below were pursued by the Debtor.

## C. Estimated Recovery By Debtor From Adversary Proceedings

The Debtor has obtained a judgment in its adversary proceeding, *Doris Panos Designs, Ltd. v. Rebecca Morse d/b/a Envi Jewelers, Tiffani Folkersken d/b/a Envi Jewelers and NV LLC d/b/a Envi Jewelers,* Ad. Pro. No. 09-08273-ast. In an Order and Judgment signed by the Court, the Debtor was awarded the amount of $ 122,439.88 with prejudgment interest from July 1, 2009. The Debtor will undertake the efforts necessary to collect the judgment and disburse the proceeds in accordance with the formula discussed in the Plan. The Debtor will split the proceeds of collection of the ENVI judgment; 50% will go directly to the unsecured creditors. This amount does not count toward the 40%

maximum distribution under the Debtor's Plan. The other 50% of the funds collected will go to the Debtor's estate to pay creditors as provided by the Plan.

The Debtor has two remaining, pending adversary proceedings. The recovery by the Debtor in regard to these adversary proceedings is too speculative to estimate with a high degree of accuracy. It is possible that a substantial recovery as a result of the successful prosecution of the Adversary Proceedings by the Debtor could result in a greater recovery for the Debtor and therefore the Estate.

## III. BACKGROUND INFORMATION ABOUT THE DEBTOR

### A. Description of Business

The Debtor, Doris Panos Designs is a New York Corporation, incorporated in 1993 with its principal office located at 130 Old East Neck Road, Melville, New York 11747. The Debtor also maintains a showroom at 2 Channel Drive, Suite 103, Port Washington, NY.

The Debtor is a designer and merchant of fine jewelry. In 1993, Doris Panos Designs, Ltd was established. To date, Doris Panos creates, on behalf of the Debtor, exquisite jewelry for some of America's Royalty and many Hollywood celebrities. The Debtor's designs have been worn by television and film screen stars.

The Debtor's designs have also been photographed and displayed on the covers of some of the most popular magazine publications across the country and were sold in Neiman Marcus and throughout the United States, through sales at jewelry boutiques, on the internet and through trade and trunk shows. The Debtor was also in the process of branching out into the international arena, having a boutique being opened by Bloomingdales to specifically display its jewelry in Dubai and other high end outlets in locations abroad.

Generally, Debtor's business model consisted of supplying various jewelry stores or showrooms with merchandise, and upon the sale of the merchandise, Debtor would be paid. Additionally, the Debtor would rely upon "Trunk Shows" and "Trade Shows" to showcase its merchandise and book orders. Although funds from sales would trickle in throughout the year, the bulk of the orders would be made during the Trade Shows in May - June. Debtor would then manufacturer merchandise and the orders delivered in September - October, with payment expected in the latter part of December and January. Due to the financial crisis of 2009, Debtor has drastically changed its business model to eliminate the amount of inventory carried, and it has developed a lower price-point line of silver and diamond merchandise for mass production and distribution to chain stores, and developed a line of costume jewelry for sale through the Home

Shopping Network ("HSN").

**B. Financial Condition of the Debtor and Events Leading to the Chapter 11 Filing**

    **1. Gerber**

        Prior to the filing of the Debtor's case, on or about June 20, 2008, the Debtor entered into a Loan and Security Agreement (the "Loan Agreement") with Gerber Finance Inc. ("Gerber"). The Loan Agreement was amended by the First Amendment dated as of June 27, 2008 and was further amended by the Second Amendment dated as of July 7, 2008, (collectively the "Gerber Credit Facility.") Gerber agreed to make revolving credit advances to the Debtor in an aggregate amount of the lesser of the Maximum Revolving Amount of $1,800,000 or an amount equal to the borrowing base.

        As security for the Gerber Credit Facility, the Debtor granted to Gerber a security interest in and to substantially all of its property and assets, whether real or personal, tangible or intangible, and whether now owned or hereafter acquired, or in which it now has or at any time in the future may acquire any right, title, or interest, including all of the following property in which it now has or at any time in the future may acquire any right, title or interest: all Accounts; all Deposit Accounts and all funds on deposit therein; all cash and cash equivalents; all commodity contracts; all investments, Stock and Investment Property; all Inventory; all Equipment; all Goods; all Chattel Paper, all Documents; all Instruments; all Books and Records; all General Intangibles; all Supporting Obligations; all Letter of Credit Rights, all books and records related to the foregoing and all proceeds and products of the foregoing (the "Collateral").

        Although considerably higher just a few months prior to filing the petition, the Debtor asserts that the total amount owed to Gerber at the filing date was One Million Three Hundred Twenty-Four Thousand Two Hundred Ninety-One Dollars and Ninety-Three Cents ($1,324,291.93), which consisted of unpaid principal and unpaid interest.

        The Debtor was required to provide Gerber with financial and other reporting under the terms of the Loan Agreement. Prior to the Debtor's bankruptcy filing, at Gerber's request, the Debtor removed both Chris Nash and Jay Wang, who were responsible for the financial and operational aspects of the Debtor's business, and, with Gerber's consent and approval, in March 2009, replaced them with Steve O'Donnell as financial consultant, to provide the requisite financial reports and projections. Mr. O'Donnell's tenure with the Debtor lasted just a few weeks. With Gerber's consent and approval, the Debtor engaged the services of Cambridge Financial to replace Mr. O'Donnell and to assist the Debtor with its finances and to negotiate a workout plan. Cambridge was subsequently retained as financial advisor to the Debtor in its chapter 11 case.

The Debtor asserts that its financial difficulties arose when Gerber notified the Debtor, on January 12, 2009, that the Debtor was in default under the Credit Facility, that Gerber would not make further advances to Debtor, and that Gerber would enforce the collection provisions set forth in the Credit Facility, including but not limited to an acceleration of all outstanding obligations. The Debtor disputed that it was in default under the Loan Agreement and made numerous allegations of lender liability against Gerber.

Gerber disputes that it in any way caused or contributed to the Debtor's financial difficulties, asserts that the Debtor was, indeed, in default under the Loan Agreement, denies that any of its conduct in respect of the Debtor gave rise to lender liability, asserts that it complied at all times with the provisions of the Loan Agreement and denies any accusation or insinuation to the contrary.

As discussed in greater detail below, after significant litigation with Gerber on issues relating to the Debtor's bankruptcy case, including (i) the Debtor's requests to incur priming DIP financing, to use Gerber's cash collateral, and for discovery of Gerber under Bankruptcy Rule 2004 and (ii) Gerber's requests to compel an inspection and appraisal of its collateral, for stay relief, to convert the case to chapter 7 and for the appointment of a chapter 11 trustee, the Debtor, the Debtor's principal, Doris Panos, and the Committee engaged in a two-day mediation at which all of the Gerber-related issues among the participants (among other issues) were resolved. As part of this resolution, the Debtor, Ms. Panos and the Committee agreed to grant Gerber a full release of all claims relating to, among other things, the Debtor or the Loan Agreement (including the lender liability-type claims referenced above), and Gerber voluntarily agreed to reduce its claim from $1,757,311.16 to $1,150,000.

Gerber withdrew its Proof of Claim by Notice dated April 26, 2010.

**2. Other Prepetition Litigation**

Prior to the filing date, the Debtor was involved in certain lawsuits. One of the creditors of the Debtor, Erol Jewelry, Inc., commenced an action against the Debtor, in or about December 16, 2008, in the Supreme Court of the State of New York, County of New York, entitled <u>Erol Jewelry, Inc. v. Doris Panos Designs, Ltd. and Doris Panos, individually,</u> under index number 603690/2008, seeking the amount of $313,743.50, for the manufacturing of jewelry pieces and setting of gemstones for the Debtor (the "Erol Litigation"). The Erol Litigation was pending at the time of the filing of the petition. Erol Jewelry, Inc. sued not only the Debtor, but also its principal, Doris Panos, under a theory of an oral guaranty. The Debtor addressed the automatic stay as it pertained to the State Court case against the Debtor via letters to the State Court, which were opposed by Erol's counsel.

In addition, one of the vendors of the Debtor, NV, LLC d/b/a Envi Jewelers, Tiffani Folkersken and Rebecca Morse d/b/a Envi Jewelers (collectively referred to herein as "Envi"), has failed to pay the Debtor for merchandise supplied and shipped to Envi's store located in Salt Lake City, Utah. The amount which Envi owes to the Debtor for the merchandise shipped to it is approximately One Hundred Twenty-Two Thousand Four Hundred Thirty-Nine Dollars and 88/100 cents ($122,439.88) plus interest, which represents the agreed and fair and reasonable value of the merchandise provided to Envi.

In an effort to recover this amount, the Debtor commenced an action against Envi, in or about March, 2008, in the Supreme Court of the State of New York, County of New York, entitled <u>Doris Panos Designs, Ltd v. NV, LLC d/b/a Envi Jewelers and Tiffani Folkersken d/b/a Envi Jewelers</u>, under index number 600933/2008 (the "Envi Litigation"). Upon information and belief, Envi is out of business.

### 3. The Debtor's Inventory

At the time of filing, the Debtor's assets consist of its personal property holdings with an estimated wholesale value as sold in the ordinary course of business of approximately Five Million Eight Hundred Sixty Thousand Nine Hundred Thirty-Six Dollars ($5,860,936.00). The Debtor's total liabilities to date were approximately Three Million Four Hundred Fifteen Thousand Six Hundred Ninety-Eight Dollars and Eight Cents ($3,415,698.08).

The majority of the Debtor's merchandise was stored in its then showroom located at 630 Fifth Avenue, New York, NY 10111, which the Debtor leased from Chopard. There was some merchandise located on consignment at eleven (11) Neiman Marcus department stores, Radcliff Jewelers in Baltimore, Maryland, Kenneth Edwards in Little Rock, Arkansas, John Michael's in Woodbury, New York and Cellini's in New York City.

## IV. <u>PROCEEDINGS DURING CHAPTER 11 CASE</u>

### A) The Chapter 11 Case

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Since the Petition Date, the Debtor has been operating its businesses as a debtor-in-possession. No trustee or examiner has been appointed.

### 1) Retention of Professionals

The Debtor sought to retain, and did retain, Thaler & Gertler, as counsel to the

Debtor by order of the Bankruptcy Court dated April 30, 2009.

The Debtor sought to retain Cambridge Financial Services, LLC ("Cambridge") as Financial Advisors for the Debtor and filed an application to do so on April 27, 2009. Due to concerns raised by the Office of the United States Trustee, an amended Application was filed on May 28, 2009 and June 26, 2009. The Court put the matter down for a hearing which was held on August 5, 2009. The Court held the hearing and approved the retention of Cambridge as its financial consultant by Order entered on August 12, 2009.

In an attempt to conserve estate resources, the Debtor also sought to retain Mayer & Co., to handle its day-to-day accounting needs. By order of the Bankruptcy Court dated February 4, 2010, the Debtor was authorized to retain Mayer & Co. as its accountants.

## 2) Attempts to Obtain Debtor in Possession Financing.

Both pre-petition and post-petition, the Debtor asserts that it had identified "investors" who were interested in either lending the Debtor funds, purchasing some or all of the equity, and/or other hybrid business arrangements, which would enabled the Debtor to either avoid the bankruptcy or which would have resulted in a quick exit from the bankruptcy. The Debtor asserts that it arranged meetings between Gerber Finance and the investors, but that Gerber did not agree to support any of the proposals made by such investors. Gerber denies having met with any bona fide potential investor.

The Debtor asserts that, throughout the bankruptcy case, it continually explored the possibility of obtaining financing in order to eliminate Gerber Finance and/or to have the working capital necessary to exit bankruptcy. The Debtor asserts that it met with several potential investors and/or lenders including but not limited to Sterling National Bank, Franklin Capital and a businessman named "Benar".

## 3) Paul Panos - DIP Lender

Subsequent to the filing of the petition, the Debtor asserts that it needed an immediate infusion of cash, which it had previously been unable to raise. Accordingly, the Debtor sought to obtain a $100,000 priming DIP Loan (the "Post Petition Indebtedness") from Paul Panos and sought permission from this Court, over the objection of Gerber, to use such proceeds in accordance with an approved budget. The Debtor prepared, filed and served a Motion as for Use of Cash Collateral and to Obtain DIP Financing on April 20, 2009.

After an emergency hearing on the motion, Court granted the motion in part, required an actual verus estimated budget to be filed by May 5, 2009 and set the matter down for a final hearing scheduled for May 8, 2009. The Court approved the use of $45,000.00 on an interim basis and set the matter down for further hearings for the approval of the remaining $55,000.00. By virtue of the settlement with Gerber discussed herein the Court adjourned the DIP Financing motion, sin die.

### 4) The Debtor's Motion to Use Existing Stationary.

On May 8, 2009, the Debtor prepared and filed a motion to authorize the Debtor to continue to use its existing business forms and stationery. The Court later granted this motion at a hearing held on June 24, 2009.

### 5) The Debtor's Motion under Rule 2004 for the Examination of Gerber.

During the Debtor's bankruptcy case, the Debtor requested copies of certain Gerber documents, which the Debtor believed may have supported the commencement of a lender liability action against Gerber. Although Gerber provided the Debtor with certain documents voluntarily, Gerber refused to provide the Debtor with all of the requested documents on a voluntary basis. On April 29, 2009, the Debtor filed a motion for a 2004 examination authorizing the examination of Gerber by an individual who has knowledge and information about various transactions detailed in the application, and the production and turnover by Gerber of all records and other documents (the "2004 Motion").

The 2004 Motion was opposed by Gerber. The Motion was adjourned a number of times in the hopes that it could be settled without further litigation. The Motion was later set down for a hearing on June 24, 2009, and granted in part by the Court. As part of the granting of the 2004 Motion, the Court also required the Debtor to provide certain documentation to Gerber. Both parties substantially complied with the Court's mandate

### 6) Gerber Inventory Appraisal

Prior to the repayment of Gerber's claim in a reduced, compromised amount, Gerber had demanded access to the Debtor's inventory (which constituted Gerber's collateral) for purposes of, among other things, inspecting and appraising such inventory. The Debtor asserts that it cooperated with Gerber in affording it such access (including notifying Gerber that the Debtor has shipped inventory out of its showroom in New York for trunk shows in Neiman Marcus stores in Michigan and Florida). Gerber disputes that the Debtor was cooperative in this effort.
On May 1, 2009 Gerber filed a motion to compel the Debtor to allow Gerber to conduct

an inventory and to evaluate the value of the inventory at the Debtor's showroom (the "Motion to Compel"). The Debtor opposed this motion because it believed that it could not afford the interruption caused by Gerber's auditors to conduct an inventory at this time. On May 5, 2009, the Debtor attended the hearing on the Motion to Compel by Gerber, at which the motion to compel was granted. Thereafter, the Debtor made its showroom available to Gerber's appraisers to conduct an analysis of certain inventory on hand.

### 7) The Debtor's Motion Pursuant to Section 366(b).

On May 5, 2009, the Debtor prepared and filed a motion pursuant to section 366(b) of the Bankruptcy Code for continuation of utility services and approval of adequate assurance of payment to the various utility companies which were providing services to the Debtor. After a hearing held on May 18, 2009, the Court granted an Order instructing that one month cash deposit was to be posted with each utility within 10 days of entry of the Order.

### 8) The Debtor's Motion to Extend its Exclusivity Periods.

On August 13, 2009, the Debtor prepared and filed a motion and proposed Order for an Order to extend the Debtor's exclusive periods to file a plan of reorganization pursuant to section 1121(D) of the Bankruptcy Code. On September 23, 2009, a hearing was held on this motion, which was granted by the Court pursuant to Order dated September 25, 2009 granting the Debtor an extension of time until November 17, 2009 to file its plan of reorganization.

A second motion and proposed Order for an Order to extend the Debtor's exclusive periods to file a plan of reorganization pursuant to section 1121(D) of the Bankruptcy Code was filed by the Debtor on November 16, 2009. On December 16, 2009, a hearing was held on this motion, which was granted by the Court pursuant to Order dated December 30, 2009. This Order granted the Debtor an extension of time until February 19, 2010 to file its plan of reorganization.

### 9) Claims Bar Date

On July 31, 2009, the Debtor prepared, filed and served a motion to set a bar date to file proofs of claim pursuant to Bankruptcy Rule 3003(c)(3) and a proposed Order Fixing Date for Filing of Claim and Notice. The Claims Bar date of October 9, 2009 was set by the Bankruptcy Court and has already passed. To date, approximately $1,031,162.29 in claims have been filed against the Estate.

The Debtor believes that it needs to amend Schedules to more accurately reflect

its liabilities at the time of the filing of the petition. To this end, the Court has directed the Debtor to file and serve a motion for an Order seeking leave to amend Schedule F and to reset the Bar Date so that any creditors whose claims may be affected by such amendment will have the opportunity to file a claim with the Court.[1] The Debtor anticipates filing objections to claims after the reset Bar Date has passed.

### 10) Negotiations with TJ Maxx

Throughout this time, Debtor aggressively redefined its business model and designed new mid and low price point merchandise to enable it to capitalize on the Debtor's recognizable name in the jewelry industry without diluting the reputation of its high price point merchandise. The Debtor had extensive meetings with representatives of T.J. Maxx and Sam's Club. Unfortunately, these repeated discussions did not culminate in any new deals for the Debtor.

### 11) Negotiations with Home Shopping Network

The Debtor also had extensive meetings with representative of Home Shopping Network ("HSN"). These discussions proved fruitful. Once the Debtor's counsel reviewed and provided comments on the contract offered by HSN, these negotiations resulted in the Debtor being booked for four (4) live on-air broadcasts of a new line developed for HSN. The Debtor receives a percentage of sales of the line.

The Debtor has held its first live on-air HSN broadcasts which showcased the new Telios by Doris Panos line of jewelry on July 8, 2010, running from 3:00 a.m. to 4:00 a.m. and again from 5:00 p.m. to 6:00 p.m. The broadcasts were a great success. Many of the new pieces sold out; HSN is assembling wait lists. According to the Recap Report received from HSN, total net sales (as of July 12, 2010) from the internet and phone was $116,532 and the total number of items sold was 4,140. The Telios line remains available for purchase on the HSN web site and the next broadcast date will be sometime in August 2010.

### 12) Claims Analysis

Now that the Debtor has proper accounting mechanisms in place, the Debtor believes it needs to amend Schedule F to reflect the correct amount of debt owed to unsecured creditors. To this end, the Court has directed the Debtor to file and serve a motion for an Order seeking leave to amend Schedule F and to reset the Bar Date (the

---

[1]     This motion is scheduled to be heard on August 18, 2010 at 11:00 a.m. in Bankruptcy Court, Central Islip.

"Reset Bar Date") so that any creditors whose claims may be affected by such amendment will have the opportunity to file a claim with the Court. The Debtor anticipates filing objections to claims after the Reset Bar Date has passed.

## B) The Debtor's Litigation Posture

During the course of the bankruptcy case, various proceedings were held before the Bankruptcy Court. These proceedings included litigation with Gerber and Chopard and the filing of three adversary proceedings. The Debtor, Ms. Panos, the Committee and Gerber also engaged in a significant mediation process which resulted in a global settlement of all issues relating to Gerber and certain significant issues between the Debtor and the Committee.

### 1) Gerber-related Contested Matters

The Debtor endeavored to have the automatic stay extended to its principal, Doris Panos. By Order to Show Cause, the Debtor prepared and filed a motion to extend the Automatic Stay pursuant to sections 105 and 362 of the Bankruptcy Code on June 15, 2009. This Motion was denied because there had been no adversary proceeding filed, and on June 17, 2009, The Debtor drafted and filed a complaint under Adversary case No. 8-09-08244 against Erol Jewelry, Inc. and Gerber Finance Inc. for injunctive and other relief.[2]

Gerber filed a motion for relief from the automatic stay or, in the alternative, for adequate protection of its interests in property on July 7, 2009. The Debtor strenuously opposed this motion, and prepared and filed papers in opposition on August 4, 2009.

Gerber filed a motion for relief from the automatic stay or, in the alternative, for adequate protection of its interests in property on July 7, 2009. The Debtor strenuously opposed this motion, and prepared and filed papers in opposition on August 4, 2009. On July 28, 2009, Gerber filed a memorandum of law in support of motion for Relief from Automatic Stay and, in the alternative, request for conversion to Chapter 7. (Gerber attempted to have a hearing held on shortened notice on this requested relief, but its application was denied.) The Debtor strenuously opposed this motion and the relief requested therein and prepared, filed and served the aforementioned papers in opposition on August 4, 2009.

On August 3, 2009, Gerber filed a motion pursuant to sections 1104 and/or

---

[2]    This adversary proceeding was later withdrawn by stipulation dated August 10, 2009.

1112(b) of the Code for the appointment of a chapter 11 trustee or, in the alternative, conversion of the Debtor's case to chapter 7. The Debtor opposed this motion and was preparing to file such opposition but, due to the events that occurred at the August 5, 2009 hearings, did not file opposition papers.

On August 5, 2009, a full-day evidentiary hearing was held on the DIP and cash collateral motions by the Debtor, and the lift stay motion by Gerber. A hearing was also held on the Application to retain Cambridge. Testimony was taken of Debtor's President, Doris Panos, Nick Jalowsky, Jennifer Palmer and Jerry Ehrenwald. At the end of the hearing, the Court announced that it was going to issue a Mediation Order and the Hon. Carla Craig would be the mediator.

### 2) The Debtor's Litigation Posture with Chopard

On June 9, 2009, the Debtor prepared and filed a motion to extend its time period under Section 365(d)(4) to assume or reject the lease by and between the Debtor and Chopard, for the property located at 630 Fifth Avenue, New York, NY 10111. A hearing was held on this motion on July 15, 2010. This motion was granted by the Court by Order dated August 3, 2009 granting the Debtor an extension of time until August 17, 2009 to assume or reject the lease.

On July 6, 2009, Chopard USA Ltd. filed a motion to compel the payment of $96,916.64 in postpetition monies for an administrative claim against the Debtor. The Debtor responded by drafting and filing papers in opposition on July 8, 2009. The motion was granted to the limited extent of directing certain progress payments to Chopard if the Debtor were to elect to remain in possession of the premises.

Due to the high cost of maintaining a showroom in Manhattan, the Debtor decided to formally reject the lease. Prior to electing to reject the Lease, the Debtor negotiated an agreement with Chopard which would permit the Debtor to continue to occupy the premises on an interim basis at a reduced monthly payment and a deferral of the unpaid portion of the rent to a later time.

Chopard, with the Debtor's assistance, was able to re-let the premises for approximately one year, thus reducing Chopard's claim against the Estate.

### 3) Mediation with Gerber and the Committee

On September 14, 2009, representatives of the Debtor, the Committee and Gerber appeared and participated in a full day mediation session in Brooklyn before Chief Judge Carla Craig. The mediation session proved fruitful, and on September 15,

2009, Debtor prepared and filed a letter giving a progress report to the Court and requesting an emergency hearing to obtain Court approval of a sale of inventory and settlement of disputed issues with Gerber. The Debtor prepared, filed and served an expedited motion to enter into an interim stipulation (the "Interim Stipulation") regarding the settlement of contested matters as a result of mediation. A hearing was held on September 17, 2009 concerning the expedited motion to compromise claims and sell the Debtor's inventory at a discount; the Court granted the motion.

On September 21, 2009, Debtor's counsel and the parties met for the second full day mediation session in Brooklyn before Chief Judge Carla Craig to further work out additional details concerning the details of the settlement. The Debtor prepared, filed and served a motion to approve the final stipulation regarding the settlement reached as a result of the second mediation session (the "Final Stipulation" and, together with the Interim Stipulation, the "Stipulations"), and a hearing on the motion was set down for October 7, 2009. On October 7, 2009, the hearing on the motion to approve the Final Stipulation was held. The motion was granted, subject to the Debtor giving all creditors and parties in interest seven days notice to object. No objections were ever filed. Accordingly, the orders approving the Stipulations and the settlement memorialized therein are now final and unappealable.

Under the terms of the Stipulations, among other things, (i) the Debtor, the Committee and Ms. Panos granted Gerber a full release of all claims and causes of action against Gerber, including any claims relating to lender liability discussed above, (ii) Gerber agreed to reduce the amount of its claim from $1,757,311.16 to $1,150,000, (iii) the Debtor agreed to sell (and did sell) the vast majority of its inventory to a division of Gordon Brothers, the well-known liquidator, and (iv) the Debtor used a portion of the proceeds of the sales to pay the reduced amount of Gerber's claim.

### 4) The Debtor's Litigation Posture with Neiman-Marcus and Other Retailers

A key component of the Gerber settlement involved the retrieval of inventory from Debtor's largest outlet, Neiman-Marcus, as well as the retrieval from several other stores. Numerous telephone conferences were held, and e-mails exchanged, with Richard Ward, Esq., of Neiman Marcus concerning the return of the Debtor's inventory and payment of monies collected by Neiman Marcus for the sale of the Debtor's inventory. As a result of these efforts which had been initiated at the time of filing, Debtor was able to retrieve well over $2 million dollars worth of inventory, which was necessary to satisfy the requirements under the Gerber settlement.

The Debtor also recovered merchandise held by Cellini Fine Jewelry on consignment and collected money owed by Cellini for merchandise it had sold.

**5) The Debtor's New Lease in Port Washington**

Due to the high cost of maintaining a showroom in Manhattan, the Debtor decided to formally reject the lease and began looking for less expensive space to move into while maintaining the security of the collateral. Due to the various covenants contained within the Gerber Finance loan documents, the Debtor had been prohibited from relocating its inventory out of Manhattan. It was not until a resolution was reached with Gerber that the Debtor could consider relocating its inventory to a less expensive location outside of New York City. Having reached a global settlement with Gerber on September 21, 2009 and the Court approving such settlement on October 7, 2009, the Debtor, between traveling for trunk shows, located several suitable new locations for offices and showroom.

The Debtor engaged in extensive negotiations with Red Wing Property Group LLC, the new landlord, for the Debtor to rent suitable but much less expense showroom space located at 2 Channel Drive, Port Washington, New York. The effect was to reduce the monthly rent of approximately $30,000.00 payable to Chopard to approximately $4,500.00 per month. This also enabled Chopard, with the Debtor's assistance, to re-let the premises for one year, thus reducing Chopard's claim against the Estate.

As a fall-back position, so that the Debtor could vacate the premises at Rockefeller Center and would have somewhere to operate if a more permanent location could not timely be found or approved, the Debtor entered into negotiations with, and had prepared, a Warehouse Inventory License Agreement with John Michaels Jewelers, so that the Debtor could operate on an interim basis if necessary.

Once the Debtor elected to reject the Lease with Chopard, it also had to negotiate a surrender agreement and had to make arrangements for the Debtor's temporary sub-tenant to vacate the premises.

The negotiations came to fruition and the Debtor filed a Motion and Order to Show Cause for approval of the new lease on October 26, 2009. On October 30, 2009, the Court held a hearing on the Debtor's motion and limited objections that were filed. After the hearing, the Debtor engaged in negotiations with the New Landlord and the Creditors' Committee to revise the lease so as to engender approval of the new agreement.

On October 30, 2009, the Court held a hearing on the Debtor's motion (the Stipulation and Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, Authorizing Debtor to Enter into New Lease for Premises by and between Doris Panos Designs, Ltd., Debtor and Debtor-in-Possession, Red Wing Property Group, LLP, Landlord) and limited objections that were filed. After the hearing, the Debtor engaged

in negotiations with the New Landlord and the Creditors' Committee to revise the lease so as to engender approval of the new agreement.

On November 9, 2009, the Debtor attended a second hearing on the proposed stipulation along with Bernard Feldman, Esq., Karl Schaffer, Esq., Doris Panos, President of Doris Panos Designs, Ltd. After a hearing, the Court approved the stipulation. On November 12, 2009, the Debtor prepared, filed and served, along with the Order, a notice to all creditors and parties in interest that they had five days from the date of service of this Order to show cause why this Order should be vacated. No objections were ever filed.

### 6) Adversary Proceedings

The Debtor filed and served three adversary proceedings (*Doris Panos Designs, Ltd. against Rebecca Morse, Tiffani Folkersken, NV LLC.*, Adversary Case No. 8-09-08273 for the recovery of money/property and the turnover of property under section 542 of the Bankruptcy Code (the "Envi Adversary Proceeding"); *Doris Panos Designs, Ltd. against Erol Jewelry, Inc.*, Adversary Case No. 8-09-08274, for the recovery of money/property and the turnover of property under sections 542 and 547 of the Bankruptcy Code (the "Erol Adversary Proceeding") and *Doris Panos Designs, Ltd. against DHW Group, Inc., Jay Wang*, Adversary Case No. 8-09-08275 for the recovery of money/property under section 547 of the Code (the "DHW Adversary Proceeding.")

In the Envi Adversary Proceeding, on November 9, 2009, Debtor prepared and filed a Motion to Authorize the entry of a default judgment in the Envi Adversary proceeding. The Debtor has obtained a judgment in its adversary proceeding, *Doris Panos Designs, Ltd. v. Rebecca Morse d/b/a Envi Jewelers, Tiffani Folkersken d/b/a Envi Jewelers and NV LLC d/b/a Envi Jewelers*, Ad. Pro. No. 09-08273-ast. In an Order and Judgment signed by the Court, the Debtor was awarded the amount of $ 122,439.88 with prejudgment interest from July 1, 2009. The Debtor will undertake the efforts necessary to collect the judgment and disburse the proceeds in accordance with the formula outlined in the Plan.

In the Erol Adversary Proceeding, the Debtor was seeking the return of four "job envelopes," three containing gold and diamonds for new merchandise orders, and one containing an existing ring and raw gold for the making of a new ring. The value of the Merchandise Transfers, at cost, is $5,900.93. In addition, the Debtor was seeking the return of $10,000.00 which was applied towards payment of an antecedent debt within the ninety (90) day period prior to the Petition Date. Erol did not file an answer by August 10, 2009, 30 days after issuance of the Summons. On November 5, 2009, the Debtor prepared and filed a Motion to Authorize the entry of a default judgment in the Erol Adversary proceeding. Erol filed an Answer on December 11, 2009 but did not

participate in a conference under Federal Rule of Bankruptcy Procedure 7026(f) or the filing of the Joint Discovery Control Plan File on March 17, 2010. A motion to strike the late answer and enter a judgment of default was denied. This adversary proceeding has been assigned to by the Court to mediation.

In the DHW Adversary Proceeding, the Debtor's counsel was in communication with counsel representing the defendant in the DHW Adversary proceeding and on November 16, 2009, a joint discovery plan was prepared and filed in the DHW Adversary Proceeding. On November 17, 2009, Debtor's counsel attended a hearing held in the DHW Adversary Proceeding, wherein the Court assigned the matter to mediation. The principal of DHW had been out of the country, and no mediation session has been held in this adversary proceeding.

### 7) Other Collection Efforts

There are ongoing collection efforts against Brinks Security for damaged merchandise. Merchandise of the Debtor that was shipped from its corporate office for overnight delivery to Neiman Marcus on Michigan Avenue in Chicago was received damaged. When an employee of the Debtor arrived at Neiman Marcus to meet the merchandise, she found a completely damaged shipping box. There was a total of four items in the box, two solid gold and diamond cuffs and two gold, colored stone diamond rings. The two cuffs and two rings packed in it were completely damaged. The two cuffs were completely ruined and the center stones of both rings were completely chipped and cracked and also not fixable. The damaged items had a total value of $27,570: two bracelets valued at $10,410 each, one ring with a value of $4,050 and one ring with a value of $2,700. Brinks has so far denied liability, claiming (falsely) that it was never notified in time about this damage. The Debtor is contemplating filing an objection to the claim Brinks' filed in this case and to commence an adversary proceeding suit against Brinks for the collection of the claim, plus interest, fees and costs.

There are ongoing collection efforts against DGI to recover merchandise.

There are ongoing collection efforts against Jeff Burke who had made an agreement to purchase merchandise from the Debtor at a discounted price, payable in 30 days of the receipt. Only $7,000.00 has been paid, leaving a balance $15,893.20 from the total invoice price of $22,893.20. Mr. Burke is claiming some sort of offset due to an alleged debt owed by the Debtor for the purchase of a billboard ad. Collection efforts are ongoing.

# V. DESCRIPTION OF THE PLAN

This summary of the Plan is qualified in its entirety by reference to the more detailed information set forth in the Plan. This section generally describes the classification and treatment of Claims and Interests under the Plan. You should refer to the Plan itself for the operative language with respect to the classification and treatment of your specific Claim or Interest.

## A. Description and Treatment of Unclassified Claims

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the following Claims are designated as unclassified Claims under the Plan.

### 1) Administrative Claims

Administrative Claims are outlined in Section 3.1(a) of the Plan and generally include any costs or expenses of administration of the Chapter 11 Case allowed under Sections 503(b), 507(a)(1) or 1114(e)(2) of the Bankruptcy Code including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business or managing the properties of the Debtor including wages, salaries, or commissions for services rendered after the Petition Date, (b) allowed Professional Fee Claims.

### 2) Priority Tax Claims

Priority Tax Claims generally include any Allowed Claim of a governmental unit, for taxes, that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. On, or as soon as reasonably practicable after, the latest of (i) the Effective Date; (ii) the date such claim becomes an Allowed Priority Tax Claim, or (iii) the date such Allowed Priority Tax Claim becomes payable pursuant to any agreement between the Proponents and each Holder of an Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, release and discharge of such Allowed Priority Tax Claim, (x) Cash equal to the Allowed Amount of such Allowed Priority Tax Claim or (y) such other treatment as to which the Allowed Priority Tax Claim Holder and the Proponents shall have agreed in writing.

## B. Description and Treatment of Classified Claims

**The treatment of Claims classified by Article 3 of the Plan is generally discussed below. You should refer to the Plan for the operative language governing the treatment of your particular Claim.**

**Class 1 – Allowed Administrative Claims**

Class 1 consists of all Allowed Administrative Claims. An Allowed Administrative Claim is a claim incurred by the debtor, with court approval, after the bankruptcy filing including necessary costs of preserving the estate, wages, salaries, court costs, lawyers' fees, accountants' fees, etc.

Upon the biannual distribution dates beginning in August 2010, or as soon thereafter as is practicable (and if such claim is for professional fees or expenses, upon a determination by the Court that such fees are reasonable and allowable), each holder of an allowed administration claim shall be paid in cash in full in an amount equal to 100% of each such allowed claim.

The estimated amount of administrative fees approaches $500,000.00. The Debtor will file an application for an Order setting an administrative bar date as soon as practicable, in order to set the amount of administrative fees. With the consent of each of the Administrative Creditors, the Debtor will seek a payout over two to three years. The Debtor proposes to pay the Administrative Fees and expenses to Class 1 Claimants on a pro-rata basis over two to three years (assuming a profit of approximately $120,000.00 - $226,000.00 per year). Such payments will take place during years One, Two and Three of the plan. This class is impaired.

**Class 2 – Allowed Priority DIP Loan of Paul Panos**

Paul Panos, the ex-husband of Doris Panos (hereinafter referred to as "Paul Panos" or the "DIP Lender") has agreed to provide DIP Financing to the Debtor so that the Debtor may continue its operations as a going concern, thus optimizing the value of the estate pursuant to the terms of the Financing Agreement.

It was critical that the Debtor had access to a post-petition financing facility. The Debtor required sufficient liquidity to satisfy ongoing cash requirements to fund ordinary course expenditures including payroll, utility expenses, overhead expenses and other expenses. During the initial stages of these proceedings, Debtor's assets were no sufficiently liquid to satisfy such obligations in the ordinary course of business without access to post-petition financing. Failure to satisfy such obligations in a timely manner would result in immediate and irreparable injury to the Debtor's estate. Therefore, post-petition financing was essential to the Debtor's ability to continue to sustain the going concern value of the estate. Mr. Panos provided such financing.

Upon the biannual distribution dates, or as soon thereafter as is practicable, Mr. Panos shall be paid in cash in full, on a pro-rata basis, the remaining DIP facility money ($55,000) plus interest on a pro rata basis during years One, Two and Three of the plan.

The claim of Mr. Panos will be paid on a pro rata basis with the Class 1 Creditors. This class is impaired. There is one creditor in this class.

### Class 3 - Allowed Unsecured Priority claims

This class contains claims of the NYS Department of Taxation and Finance ("NYS"). The Debtor has filed its tax returns. NYS has amended its proof of claim to reflect an unsecured priority claim of $1,587.58 (and a general unsecured claim of $2,016.16.) This amount shall be paid upon the effective date of the Plan, or as soon thereafter as is practicable.

### Class 4 - Allowed General Unsecured claims

Class 4 consists of all Allowed General Unsecured Claims. A General Unsecured Claim is a Claim arising on or before the Petition Date that is not an Administrative Claim, Priority Tax Claim, a Claim resulting from being the Holder of Interests of the Debtor or a Secured Claim. General Unsecured Claims also include any rejection damage claims asserted and timely filed resulting from the Debtor's rejection of any executory contract or unexpired lease. All Allowed Unsecured Claims, now estimated after further review in the amount of $1,500,000, will be paid *pro rata* from the above sums paid in installments over Years Three, Four, Five (and if necessary), Six and Seven of the plan. This class is impaired.

### Class 5 - Allowed General Unsecured Subordinated claim of Doris Panos

Doris Panos holds a general unsecured claim in the amount of $300,000. This sum consists of loans Ms. Panos made to the Debtor over a span of many years. Ms. Panos will subordinate her business loans of approximately $300,000. There will be no equity distribution to shareholders, except for salary, over the life of the Plan. This class is impaired.

### Class 6 – Interests

Class 6 consists of the Holders of Interests in the Debtor; the allowed claim of Doris Panos, the shareholder of the Debtor. "Interest" means any stock, membership or other equity ownership interest in the Debtor and all dividends and distributions in respect of such stock or interest, all rights options or other rights to acquire any equity ownership interest in the Debtor as of the Petition Date and any "equity security" interest in the Debtor (as that term is defined in Section 101(16) of the Bankruptcy Code). To the extent that any Estate Assets remain after all Unclassified Claims, other Allowed Claims and all payments required under the Plan have been paid in full, the Holders of Interests in the Debtor shall retain any remaining Estate Assets. This Class

shall retain its Equity Interest in the reorganized Debtor.

The Plan comports with the requirements of the Absolute Priority Rule. Code Section 1129(b)(2)(B)(ii), known as the absolute priority rule, provides in relevant part:

For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) with respect to a class of unsecured claims-

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property

Ms. Panos shall retain her interests in the reorganized Debtor. The consideration for the retention of this equity interest shall be the subordination and waiving of her Allowed General Unsecured Subordinated claim and her design of all new inventory lines including but not limited to the DP Sterling line and the Costume Line developed for Home Shopping Network. There will be no new capital infusion by the shareholder. There will be no equity distribution to shareholders, except for salary, over the life of the Plan.

Holders of Classes 1, 2, 4 and 5 are Impaired under the Plan and therefore are entitled to vote on the Plan.

## C. Conditions to Confirmation of the Plan

The Plan provides that in order for Confirmation to occur, the following conditions must be satisfied:

(a) entry of an Order finding that this Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code;

(b) the proposed Plan of Reorganization shall be in form and substance acceptable to the Proponents; and

(c) the proposed Confirmation Order shall be in form and substance acceptable to the Proponents.

## D. Conditions to Occurrence of the Effective Date

The Plan provides that in order for the Effective Date to occur each of the following conditions must either be satisfied or be waived by the Proponents:

(a) The Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Proponents;

(b) The Confirmation Order shall provide that the Proponents are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, leases and other agreements or documents created in connection with the Plan;

(c) The Confirmation Order shall provide that all actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

## E. Description of Certain Other Significant Plan Provisions

### 1) Proofs of Claim for Rejection Damages

Any party to an Executory Contract or unexpired lease that is rejected pursuant to the Plan is entitled to file a Claim against the Debtor for rejection damages. All proofs of claim with respect to Claims arising from the rejection of any Executory Contract or unexpired lease shall be filed with the Bankruptcy Court within the later of: (i) the date of the Bankruptcy Court order approving the Debtor's rejection of such Executory Contract or unexpired lease, or (ii) thirty days after the Confirmation Date. Any Claim not filed within such time shall be forever barred against the Debtor, its estate and property, and shall be disallowed in full. Claims arising from the rejection of executory contracts or unexpired leases, to the extent Allowed, shall be treated as Class 5 - General Allowed Unsecured Claims under the Plan.

### 2. Late Filed Claims

No Distribution shall be made on account of any Claims filed after the Bar Date, or the Reset Bar Date unless specifically allowed by Final Order of the Bankruptcy Court after notice and opportunity for hearing provided that any Administrative Claim or Professional Fee Claim not filed within the deadlines set forth above shall be forever barred, and the Debtor shall be discharged of any obligation on such Claim.

### 3. Disputed Claims; Distribution Rights

No payments or distributions will be made with respect to any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been determined by a Final Order of the Bankruptcy Court or the Claim otherwise becomes an Allowed Claim.

### 4. Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order or the Effective Date having

occurred, the Plan provides that the Bankruptcy Court will retain jurisdiction to the full extent permitted by law including, without limitation, to:

Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

Hear and determine all matters with respect to the assumption or rejection of any Executory Contract (including unexpired leases) to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required cure of the liquidation or allowance of any Claims arising therefrom;

Effectuate performance of and payments under the provisions of the Plan;

Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under or related to the Chapter 11 Case;

Hear and determine any and all Estate Actions or any Other Causes of Action;

Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with

implementation, consummation, or enforcement of the Plan or the Confirmation Order;

Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

Hear and determine any matters arising in connection with or relating to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

Enforce all orders, judgments, injunctions, releases, exculpations, indemnification and rulings entered in connection with the Chapter 11 Case;

Except as otherwise limited herein, recover all Estate Assets, wherever located;

Hear and determine all avoidance actions and Other Causes of Action;

Hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

Hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

Modify the Plan at the request of the Proponents and as provided by applicable Law;

Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

Enter a Final Decree closing the Chapter 11 Case.

**5. Unclaimed Distributions**

(a) Unclaimed and undeliverable Distributions shall include: (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (ii) checks (and the funds represented thereby) which have been issued to the holder of an Allowed Claim or Allowed Interest in accordance with the Plan but which have not been presented for payment within one hundred and twenty days (120 days) after the date of such checks, and (iii) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a complete or correct mailing address. If any distribution made on account of an Allowed

Claim or Allowed Interest is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Creditor or Interest holder unless current address. Subject to paragraph (b) below, undeliverable Distributions shall remain in the possession of the Disbursing Agent until such time as such Distribution becomes deliverable. Undeliverable Distributions shall not be entitled to any interest or other accruals of any kind. Nothing in the Plan shall require the Disbursing Agent to make more than a reasonable attempt to locate any holder of an Allowed Claim or Allowed Interest.

(b) In the event that any Distribution on account of any Allowed Claim or Allowed Interest remains undeliverable or unclaimed for a period of one hundred twenty days after the date of the check (the "Claiming Period"), the entire unpaid Allowed Claim or Allowed Interest upon which such Distribution was issued shall, on the first Business Day after expiration of the Claiming Period, be deemed expunged and reduced to zero ($0) dollars. The proceeds of all unclaimed and undeliverable Distributions shall, after the expiration of the Claiming Period, be distributed Pro Rata to Creditors that have not been paid the full Allowed Amount of their Claims, in the Order of their priority.

### 6. Miscellaneous Provisions

The Plan contains a number of miscellaneous provisions not separately discussed in this Disclosure Statement, including provisions for modification of the Plan pursuant to the Bankruptcy Code and withdrawal of the Plan. Parties should review the Plan itself for details of such provisions.

## VI. FEASIBILITY AND RISK FACTORS

### A. Feasibility of the Plan

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, one of the requirements for confirmation of a plan of reorganization is a determination by the Bankruptcy Court that the plan is feasible -- that is, that confirmation of the plan is not likely to be followed by liquidation or by the need for a further financial restructuring, unless same is specifically provided for in the plan. Since the Plan provides for the sale of the Debtor's assets and does not include the sale of the Debtor's new jewelry lines as being part of the funding of the Plan, there should be little question about the feasability of the Plan as is.

### B. Risk Factors

As with any plan of reorganization or other financial transaction, there are certain risk factors which must be considered. It should be noted that all risk factors

cannot be anticipated, that some events will develop in ways that were not foreseen and that many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While every effort has been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analysis set forth herein. Under the Plan, some of the principal risks that Holders of Claims should be aware of, in the view of the Proponents, are as follows:

The Plan is subject to approval by the Holders of Claims in Classes 1, 2, 4 and 5 which are the only Classes entitled to vote on the Plan.

No assurance can be given that the Plan will be accepted by these Classes or confirmed by the Bankruptcy Court. Failure of the Holders of Claims in Classes 1, 2, 4 and 5 to vote for the Plan or a decision by the Bankruptcy Court to deny confirmation of the Plan could lead to delay and the incurrence of additional expenses.

The actual amount of all Allowed Claims in any Class and the amounts estimated for Priority Tax Claims and Administrative Claims may differ from the estimates provided herein. Accordingly, the amount and timing of the Distributions that will ultimately be received by any particular Holder of an Allowed Claim may be materially and adversely affected should the estimates be exceeded as to any Class or Administrative or Priority Tax Claims.

The tax consequences of the Plan may vary from the anticipated consequences and could result in less funds being available for distribution to the Holders of Allowed Claims.

The foregoing risks are inherent in any liquidation, including that by a chapter 7 trustee.

## VII.  ALTERNATIVES TO THE PLAN

The Bankruptcy Code requires as a condition to confirmation that creditors receive, on account of their claims, at least as much as they would receive if the case were a case under chapter 7 of the Bankruptcy Code. Because the Plan provides for the sale of the Debtor's inventory and the Distribution of the proceeds in accordance with the priorities afforded claimants under applicable law and under chapter 7 of the Bankruptcy Code, the Proponents believe that the Plan meets this test. However, if the Plan is not confirmed or consummated, the alternatives include: (i) a conversion of the case to a liquidation case under chapter 7 of the Bankruptcy Code; or (ii) confirmation of an alternative chapter 11 plan. It is also possible that the chapter 11 Case could be dismissed.

## A. Liquidation under Chapter 7 of the Code

In evaluating the Plan, the Proponents have considered the alternative of a liquidation of its assets under chapter 7 of the Bankruptcy Code. The Proponents believes that the Plan serves to allow the Holders of Allowed General Unsecured Claims and the Holders of Interests in the Debtor to vote on approval of the Plan and thereby exercise some control over the liquidation and Distribution process and expedite Distributions to Holders of Allowed Claims.

The liquidation analysis annexed hereto at **Exhibit "C,"** clearly shows that there would be no benefit to the Estate or creditors by conversion to chapter 7 and it fact such conversion would work to the detriment of the creditors of this Estate.

In a chapter 7 case, an independent trustee would be appointed to liquidate the Debtor's remaining inventory. An interim trustee would be chosen by the United States Trustee's Office for the Eastern District of New York. The Chapter 7 trustee would handle all decisions with respect to the liquidation of the Estate, the hiring of professionals, the pursuit of any claims or litigation, the payment of or objection to Claims, and the Distribution of any ultimate dividend.

The Chapter 7 trustee would be paid pursuant to the provisions of Section 326(a) of the Bankruptcy Code, although, in certain circumstances, a chapter 7 trustee can apply to the Bankruptcy Court for a different type of compensation. These fees and costs would be paid prior to payment of chapter 11 administrative expenses and prior to payment of General Unsecured Claims. Pursuant to the Bankruptcy Code, in a chapter 11 case, creditors whose Allowed Claims are Impaired are entitled to vote to approve the procedure by which the Estate will be liquidated and the way the Estate Assets will be distributed. This right to vote allows such creditors to examine the Plan and understand the potential recovery for creditors as well as the risks. On the other hand, in a chapter 7 case, the chapter 7 trustee makes all of the decisions as tempered by the Bankruptcy Code regarding liquidation and distribution of estate assets.

If the Chapter 11 proceeding of Doris Panos Designs, Ltd. converts to a Chapter 7 liquidation case, we assume the following liquidation scenario using the May 31, 2010- balance sheet as reported to the Court.

Only about $19,500 of the reported $372,675 (as of May 2010) in accounts receivable would be assumed collectible. The roughly- $353,000 in other receivables are extremely past due or in dispute. Therefore, the Debtor assumes that it would take approximately four (4) months to collect the remaining receivables with a 20% reduction in value to offsets and administrative costs.

Inventory is reported on the balance sheet at approximate cost, which averages

about 60% of the wholesale value of the products. If the Debtor had to sell all of its remaining inventory (valued at $560,000) in a discounted sale, it is more likely that such a sale would only generate, at best, 33% of its current stated value or about $186,667.00. In liquidation however, it is more likely that the inventory would be sold for melt/smelt value, which is about 24% of the wholesale value. The amount realized would be even less, or only $134,400.

All furnishings and equipment of the Debtor are assumed to be worth roughly $20,500. There are no other assets of significant value to be liquidated.

The net amount of this assumed liquidation is approximately $188,000.00 after an appointed Chapter 7 Trustee's estimated fees. The estimated amount of administrative fees including the Debtor's counsel, the Unsecured Creditors' Committee Counsel, administrative fees to Chopard, the Debtor's other professionals, etc., approaches $500,000.00. Neither amount as listed above would be enough to pay the claims of the Administrative Creditors in full. The Debtor's chapter 7 estate would be administratively insolvent from the start.

The Proponents believe that the Plan serves to expedite Distributions to Holders of Allowed Claims. Further, the Plan avoids the additional costs and expenses to the liquidation and distribution process incident to the liquidation of the inventory in Chapter 7. A chapter 7 Trustee is entitled to reasonable compensation, upon application to the Bankruptcy Court, under the provisions of the Bankruptcy Code. In addition, a chapter 7 Trustee would retain his own professionals including but not limited to attorneys, accountants and auctioneers. Due to the foregoing, the Proponents believe that there would be no benefit to the Estate or creditors by conversion to chapter 7.

**B. Alternatives to the Debtor's Plan.**

If the Plan is not confirmed, any other party in interest, subject to order of the Bankruptcy Court, could attempt to formulate a different Plan. The Proponents believe that significant additional costs, risks and delays would be incurred in connection with any alternative Plan, and that no party in interest has more incentive to create the best possible Plan for creditors than the Proponents. As argued by the Proponents before the Bankruptcy Court, it is unlikely that an alternative plan could be confirmed under the provisions of Section 1129(a) of the Bankruptcy Code without the express consent of the Proponents.

While it is certainly possible that, if the Plan is not confirmed, another plan could eventually be proposed, the Proponents believe that it is highly unlikely that any plan could be developed which would provide greater value or certainty of closure than the

Plan proposed hereby. In addition, any such Plan would greatly increase in the Administrative claims against the estate, which are already extremely high to begin with. All of the additional administrative expenses would have priority over the claims of the Class 4 General unsecured creditors and reduce the distribution to unsecured creditors on a dollar-for-dollar basis.

## VIII.  TAX CONSEQUENCES OF THE PLAN

THIS DISCLOSURE STATEMENT DOES NOT ADDRESS THE PARTICULAR FEDERAL INCOME TAX CONSEQUENCES THAT MAY BE RELEVANT TO TAXPAYERS UNDER THE FEDERAL INCOME TAX LAWS, NOR DOES IT DISCUSS ANY ASPECT OF FEDERAL, STATE, LOCAL OR FOREIGN TAX LAWS THAT MAY BE APPLICABLE TO PARTICULAR TAXPAYERS. THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS, INCLUDING THE AVAILABILITY OF WORTHLESS DEBT DEDUCTIONS, IF ANY, MAY VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. EACH CREDITOR AND EQUITY HOLDER TREATED BY THE PLAN IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN.

## IX.  REQUIREMENTS  FOR CONFIRMATION

In order to confirm the Plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtor, including

> that the Plan has classified Claims and Interests in a permissible manner;
> that the Plan complies with the applicable provisions of the Bankruptcy Code;
> that the Debtor has complied with applicable provisions of the Bankruptcy Code;
> that the Debtor has proposed its Plan in good faith and not by any means forbidden by law;
> that the disclosures required by Section 1125 of the Bankruptcy Code have been made;
> that the Plan has been accepted by the requisite votes of creditors (except to the extent that Confirmation is available under Section 1129(b) of the Bankruptcy Code);
> that the Plan is feasible and that Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor;
> that the Plan is in the "best interests" of all Holders of Claims or Interests in an Impaired Class by providing the such Holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that any such Holder would receive or retain in a chapter 7 liquidation,

unless each Holder of a Claim or Interest in such Classes accepts the Plan;
that all fees and expenses payable under 28 U.S.C. § 1930, as determined by the
Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan
provides for the payment of such fees on the Effective Date; and
that the Plan provides for the continuation after the Effective Date of all retiree
benefits, if any, as defined in Section 1114 of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code permits the Bankruptcy Court to confirm
a plan notwithstanding the failure to obtain the requisite acceptance of the plan for each
Impaired Class of Claims or Interests, as long as one Impaired Class of Claims accepts
the plan. This procedure is known as "cram down." The Plan may be confirmed over
the non-acceptance of an Impaired Class if the other Confirmation requirements set
forth in Section 1129(a) (other than paragraph (8)) are met, the Plan does not unfairly
discriminate with respect to such Class and (i) the members of the non-accepting Class
receive full payment of their Allowed Claim or Allowed Interests or (ii) the holders of
Claims or Interests in such Class are to receive less than full payment, but no Class
junior to the non-accepting Impaired Class receives or retains any property under the
Plan. If the applicable requirements of Section 1129(a) of the Bankruptcy Code, other
than paragraph 8 thereof, are met with respect to the Plan, the Debtor will request that
the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code.

## X. CONCLUSION AND RECOMMENDATION

The Proponents submit that the Plan complies in all respects with chapter 11 of
the Bankruptcy Code, is fair and equitable, and provides for a greater, more immediate
and certain return than would likely be achieved under any other reasonable
alternative. Therefore, the Proponents strongly recommend that Holders of Claims who
are entitled to vote on the Plan vote to accept the Plan.


Dated: East Meadow, New York          Thaler & Gertler, LLP
     July 16, 2010                  Attorneys for Debtor
                                       and Debtor-In-Possession
                                       90 Merrick Avenue; Suite 400
                                       East Meadow, New York 11554
                                       Phone: 516.228.3553
                            By:        /s/ Richard G. Gertler
                                       Richard G. Gertler, Esq.

W:\Clients A-Z\Clients A-E\Doris Panos Designs\Bankruptcy\Plan & Disclosure statement\Amended Plan&Disclosure Statement\7-16-2010
Disclosure\Revised Amended Disclosure Statement 7-15-2010.wpd

Page 33 of 33